457 So.2d 1159 (1984)
STATE of Louisiana
v.
Jimmy C. WINGO.
No. 84-KA-0260.
Supreme Court of Louisiana.
September 10, 1984.
Concurring Opinion October 15, 1984.
Rehearing Denied November 15, 1984.
*1162 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Dist. Atty., James M. Johnson, Asst. Dist. Atty., for plaintiff-appellee.
Charles E. McConnell, Minden, Thomas Guilbeau, Lafayette, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of death. The conviction and sentence were based on evidence that defendant and Jimmy Glass killed a married couple during the perpetration of an aggravated burglary and armed robbery in the victims' home. The principal issues on appeal are (1) whether the evidence was sufficient to support the jury's finding that defendant, although not proved to be the triggerman, had the specific intent to kill or inflict great bodily harm upon the victims; (2) whether the trial judge committed reversible error by denying individual voir dire, by failing to sequester jurors after acceptance, and by excluding psychological evidence on "death-qualified" juries; (3) whether a police officer's unresponsive comment on direct examination that defendant stated "he always wore gloves when committing a crime" constitutes evidence of other crimes that requires reversal of the conviction; (4) whether the trial court erred in refusing to allow defense counsel during his opening statement to quote from the prosecutor's closing argument in the trial of co-perpetrator Glass; (5) whether the trial judge properly excluded psychological testimony about the positive benefits to society and to an inmate in allowing a person to serve a life sentence; (6) whether the trial court erred in allowing references to other crimes both during the cross-examination of a clinical psychologist, who was a defense witness in the penalty phase, and during the testimony of rebuttal witnesses; and (7) whether the death sentence was excessive.[1]
After considering every assignment of error, including those abandoned or not argued on appeal, and after making an independent review of the record, we affirm the conviction and sentence.
Facts
During the evening of December 24, or the early morning hours of Christmas Day, 1982, burglars forcibly entered the rural Webster Parish home of Mr. and Mrs. Newt Brown by smashing a glass door. They bound and gagged the Browns, ransacked the house, and stole a large amount of money, a .38 caliber pistol, a .30-.30 lever action rifle, a shotgun, and some items of clothing. Mr. and Mrs. Brown were shot to deatheach with a single gunshot wound to the head inflicted with a .38 caliber weapon. The Browns' automobile was stolen and was later discovered abandoned near the home of Mr. and Mrs. Frank Whittington, defendant's sister and brother-in-law.
Earlier on that same Christmas Eve, defendant and Glass had escaped from the Webster Parish jail, which was located only a few miles from the Browns' home. Defendant and Glass were penniless and were wearing jail clothes when they fled down an elevator while the deputy who was guarding them turned aside to tend to a disturbance.
Around daybreak on Christmas Day, defendant and Glass arrived in Vivian, Louisiana, at the Whittingtons' home where defendant's girlfriend, Gwen Hill, also resided.[2] Defendant and Glass were armed with a .30-.30 lever action rifle, a .38 caliber revolver, and a shotgun, and each had $900 in cash. They also had various articles *1163 of clothing which fit the description of clothing stolen from the Browns' home.
Both men explained to Whittington that the guns and the money had been stolen from a house. Defendant told Ms. Hill that Glass had gone into the house while he waited outside and that they had split the money.
Defendant, Glass and Ms. Hill (according to her testimony) commandeered a truck from another of defendant's sisters and fled to Atlanta, Texas, where defendant and Ms. Hill checked into a motel room using fictitious names. Glass drove on to Little Rock, Arkansas, where he caught a bus to California.[3] While at the motel in Texas, Ms. Hill and defendant saw a news broadcast reporting the murder of the Browns and displaying photographs of defendant and Glass as the wanted suspects. The report stated that Glass' fingerprints had been discovered in the victims' house and on the passenger side of the victims' automobile. Upon seeing the broadcast, defendant and Ms. Hill fled into the woods, where defendant buried a shotgun and some coins from the house he and Glass had robbed, as well as the label he had torn off the cap he was wearing.[4] After several days, the police apprehended them in the woods with the aid of tracking dogs. Defendant surrendered peacefully, despite earlier statements to Whittington and Ms. Hill that he would "not be taken alive".
After being arrested, defendant, a former police officer, made a comment to one of the officers to the effect that he "always wore gloves" when he committed a crime in order to avoid leaving fingerprints. The police found a pair of gloves in defendant's sleeping bag which fit the description of a pair of Mrs. Brown's garden gloves. These gloves left a "fabric impression" similar to that discovered in a drawer in the Browns' dresser which had been dumped by one of the burglars.
Glass and defendant were indicted for first degree murder.[5] Because of extensive publicity surrounding the crime and defendant's arrest, the trial court granted defendant's request for change of venue and transferred the case to Lafayette Parish.
After the state presented evidence establishing the above facts during the guilt phase of defendant's trial, the defense presented no evidence. Defense counsel argued forcefully to the jury that the state's evidence failed to establish that defendant either was a participant in the killings or had the specific intent to kill the victims, and the trial court instructed the jury that a verdict of first degree murder required a finding that defendant had the specific intent to kill or inflict great bodily harm. The jury found defendant guilty as charged.
At the penalty phase, the state offered no additional evidence, but the defense offered considerable evidence of mitigating circumstances.[6] Several character witnesses (including the mayor and chief of police of the small town where defendant had *1164 served as a police officer) testified as to defendant's good reputation with respect to being a non-violent person. A clinical psychologist testified that he concluded, from the background data furnished by defendant and from a series of psychological tests, that defendant had a non-violent disposition. Several relatives, including defendant's two young sons, described him as a good parent and pleaded for his life. A priest testified that he interviewed defendant and concluded that defendant held basic Christian religious beliefs. An inmate from the Department of Corrections, who was serving a life sentence, testified concerning the positive contributions made by "lifers" to the prison community.
Defense counsel argued to the jurors, and the trial court instructed them, that the law provided for a sentence of life imprisonment without parole if one of them did not agree that a sentence of death was appropriate for this offense and this offender. The jurors unanimously recommended the death sentence. Sufficiency of the Evidence (Assignment of Error No. 48)
The evidence clearly established an aggravated burglary, an armed robbery, and two specifically intended killings during the course of those aggravated felonies. The only serious question relates to defendant's role in the killings and the proof of his specific intent.[7]
The jury had ample circumstantial evidence from which to reasonably conclude that defendant was with Glass in the bedroom where the murder occurred. He escaped with Glass shortly before from a nearby jail. Like Glass, he had a pressing motive to steal money (both were penniless), clothes (both had only jail outfits), transportation (both were seeking to flee the area), and weapons (both vowed not to be "taken alive"). He and Glass appeared together at his relatives' home shortly after the crime with clothes, guns, and money which were identical or very similar to items stolen during the break-in at the Browns' home. He and Glass made statements that they had "robbed" a house to secure the money and guns. He and Glass took a vehicle from his relatives without their consent and continued their flight to Texas. When defendant found that he was being hunted in connection with the murders, he fled into the woods, where he concealed various items which could be identified with the Browns' home. Upon being captured, defendant had a pair of gloves in his possession which matched the fabric print made by a glove on a ransacked dresser drawer in the Browns' home, and he made a highly incriminating statement ("I always wear gloves when I commit a crime") to an arresting officer.[8] Finally, a fiber found on pants left by defendant at the Whittingtons' home matched the fiber of a blanket on the Browns' bed where the bodies were found.
Because Glass refused to testify and defendant elected to exercise his constitutional right not to testify, there was no direct evidence (in the guilt phase) of defendant's role in these crimes. Nevertheless, *1165 a rational juror, viewing the overall evidence in the light most favorable to the prosecution, could have concluded beyond a reasonable doubt that defendant actively participated in the killing of the victims (whose deaths were obviously purposefully inflicted). Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Given the evidence presented, it was certainly reasonable for the jury to conclude that defendant's role was that of an equal partner in all of the crimes committed by the two during this episode, including the murders. The theory that Glass (who was significantly smaller than both defendant and Mr. Brown) broke in alone and overpowered the Browns while defendant waited outside, unaware that Glass would kill the helpless victims, is simply not a compelling hypothesis, and the jury acted reasonably in rejecting it. See State v. Captville, 448 So.2d 676 (La.1984); State v. Chism, 436 So.2d 464 (La.1983); State v. Sutton, 436 So.2d 471 (La.1983).
Refusal of Individual Voir Dire and of Research Evidence on "Death-Qualified" Juries (Assignments of Error Nos. 6, 9, 12, 13, 14, 15, 17, 18 and 48A)
Defendant complains that the trial judge conducted voir dire in groups of 12 prospective jurors, arguing that individual voir dire would have reduced pressures on the veniremen in their responses in this capital case. Defendant also complains that the trial judge failed to sequester those accepted as jurors during the questioning of the remaining jurors.
When a trial judge does not sequester accepted jurors during the remaining voir dire, he risks the possibility that the accepted jurors may be so tainted by a prejudicial response to a question that a mistrial may be necessary. Similar risks of disqualification of prospective jurors are encountered when voir dire is conducted in large groups, and voir dire individually or in smaller groups is arguably more desirable in highly sensitive cases. Nevertheless, the conduct of voir dire is a matter entrusted to the sound discretion of the trial court. Absent special circumstances, the trial court does not err in refusing such requests. The fact that defendant's case is capital does not by virtue of that fact alone establish a "special circumstance" requiring a variation from the general rule of trial court discretion. See State v. Lindsey, 404 So.2d 466 (La.1981); State v. Copeland, 419 So.2d 899 (La.1982). The record does not establish any prejudice in the present case.
Defendant also argues that the trial court erred in not permitting him to present psychological evidence that jurors who pass the standards set forth in La.C. Cr.P. Art. 798 (i.e., those who can consider the imposition of a capital verdict) are more "conviction prone".[9] The proffered expert, according to defense counsel, was to testify as to "meta research" (studies about which he had read, but not actually conducted) which would support this claim. This same sort of "evidence" has previously been rejected by this court in State v. Smith, 437 So.2d 802 (La.1983). The trial court did not abuse its discretion in refusing to hear the testimony of the psychologist. See also State v. Glass, above.
Defendant's Statement About Wearing Gloves (Assignments of Error Nos. 44, 46 and 47)
During the state's direct examination of one of the arresting officers, the prosecutor asked if the officer had obtained anything from defendant at the time of the arrest. The officer answered that "I obtained a pair of gloves that he said he always used when he committed a crime because he did not ...." The officer's further explanation of this unsolicited comment was halted by a defense objection and mistrial motion. The trial court denied the mistrial motion. The prosecutor did not pursue the matter. On appeal, defendant contends that the conviction should be reversed *1166 because of this impermissible reference to another crime as to which evidence was not admissible.
The purpose of the question was to establish that defendant had a particular pair of gloves, thereby connecting him with the fabric impression left by similar gloves on the bureau drawer in the Browns' home, while also explaining the absence of defendant's fingerprints in the home and car where Glass' fingerprints were found. The officer's expansive answer was unsolicited and unresponsive.
Since the alleged reference to other crimes was not made by the prosecutor or any court official, La.C.Cr.P.Art. 770's mandatory mistrial provision is not applicable. State v. Perry, 420 So.2d 139 (La. 1982). The decision on the motion for mistrial was therefore governed by La.C.Cr.P. Art. 771, which does not require a mistrial unless the remark was solicited by the prosecutor or a mistrial is necessary to assure a fair trial.
The comment merely implied that defendant may have committed an unspecified prior crime. Mistrial is a drastic remedy, and defense counsel did not ask for an admonition or limiting instruction. The prosecutor dropped the matter immediately and tendered the witness for cross-examination. Moreover, the jury already knew that defendant was in jail for having committed a prior crime.[10] Under the circumstances, the failure to order a mistrial was not an abuse of the trial court's discretion.
Refusal to Permit Defense Counsel to Quote from the Prosecutor's Argument in the Glass Trial (Assignment of Error No. 27)
Defense counsel, in his opening statement, commented that the prosecutor's opening statement about the state's evidence was contrary to his position on the same evidence which he had stated in argument during the Glass case. Defense counsel was obviously implying that the prosecutor was adopting inconsistent positions, thereby suggesting that the prosecutor's position in the present case was not necessarily consistent with the "truth".
When the district attorney objected, the jury was removed. Defense counsel argued to the trial court that the prosecutor during closing argument in Glass' trial pointed out that no wrenches had been found in the Browns' house, although Glass had testified that defendant had entered the home armed with some wrenches stolen from Mr. Brown's truck.[11] (This was part of Glass' attempt to place the entire blame on defendant by testifying that he killed the Browns only because defendant forced him to do so at gunpoint.) The trial judge ruled that defense counsel could not refer in his opening statement to the prosecutor's argument in the previous case.
This case does not present a situation in which the prosecutor has adopted such a fundamentally inconsistent position in the separate trials of two co-perpetrators that basic fairness might require the trial court to permit the exposure of the inconsistent positions. Here, there was simply a question of the prosecutor's emphasis on the facts relating to culpability of the particular defendant on trial. Each defendant had attempted to shift culpability to the other, and the prosecutor in each case simply pointed out to the jury the evidence reflecting on the culpability of the defendant on trial and the reasonable inferences drawn from the evidence.
*1167 When defense counsel chooses to make an opening statement, he is limited to an explanation of the nature of the defense and a discussion of the facts which might be proved by admissible evidence. See State v. Burnette, 337 So.2d 1096 (La. 1976). Of course, arguments of counsel are not evidence. Here, defense counsel in his opening statement improperly attempted to argue about the prosecutor's closing argument in a previous (although closely related) case. The prosecutor's theories and comments (his opinion of what the evidence proved) at another trial was simply not "evidence" which could properly be admitted during the trial in the present case. Therefore, the trial court did not improperly restrict defense counsel's opening statement.
Exclusion of Expert Testimony on Positive Benefits to Society by Imposition of Life Sentence (Assignment of Error No. 60)
Defendant offered Nancy Goodwin as an expert witness regarding the "positive benefits to society and to an inmate in allowing a person to serve a life sentence". Ms. Goodwin was not qualified as a penologist. However, Ms. Goodwin had a Masters Degree in English and had taught prison literature in the criminal justice program at Loyola. She explained that prison literature concerned "how the prison experience had been portrayed by different prisoners in this country and in other countries".
Defense counsel asked Ms. Goodwin if she had observed any positive benefits to society from allowing persons to serve life sentences. After she responded positively, the prosecutor objected that her testimony did not relate to the particular defendant on trial. When the trial judge determined that she had not even interviewed defendant, he sustained the objection. He also refused to grant a recess to allow Ms. Goodwin to interview defendant. As his reason for maintaining the objection to the testimony, the trial judge stated that it was not relevant or material to the "character and propensities of the defendant".
In State v. Watson, 449 So.2d 1321 (La. 1984), this court approved the trial judge's exclusion of testimony of experts in the field of Christian morality as irrelevant to the sentencing phase of a first degree murder trial. This court reasoned that an "individual's opinion that the death penalty has no place in the criminal justice system is irrelevant to a sentencing jury's deliberations" and stressed that evidence of mitigating circumstances must be focused on the particular offender. See also State v. Brogden, 457 So.2d 616 (La.1984), decided this day.
In the present case, the trial judge did not abuse his discretion in excluding the witness' personal opinion regarding the positive benefits of imposition of life imprisonment instead of the death penalty. Such an opinion is more properly addressed to the Legislature.
Similarly, the decision whether to allow a recess is one of the matters entrusted to the sound discretion of the trial judge. Here, defense counsel did not show how the witness' conferring with defendant would make her opinion regarding capital punishment relevant to this case. There was no abuse of discretion.
Reference to Other Crimes During the Penalty Phase (Assignments of Error Nos. 58, 59, 63, 64, 66, 67, 68, 69 and 70)
During the penalty phase, defendant called a clinical psychologist to give his opinion concerning defendant's disposition for violence. The psychologist had interviewed defendant and had administered a battery of tests, during which defendant described a series of burglaries as the only prior crimes for which he had ever been arrested. As a result of the interview and the test results, the psychologist concluded that defendant was a non-violent person because he had no history of "aggressive crimes". This evidence, of course, was significant to defendant's contention that Glass acted alone, without the aid or encouragement of defendant, in the killing of the victims.
*1168 On cross-examination, the prosecutor asked the psychologist whether his opinion would be affected if defendant had misrepresented any facts concerning his criminal history. The psychologist replied affirmatively. The prosecutor then asked the psychologist a series of questions relating to whether he considered burglary a violent crime (to which he gave a negative reply) and whether he considered a burglary in which the perpetrator totally devastates a home as a crime reflecting aggressive and violent behavior. The psychologist admitted that he would not know how to interpret a situation in which an individual committed such an offense, particularly if the offender stated that the reason for his destructive acts was that he "did not like someone who had more than he had".
When defendant subsequently took the stand, the prosecutor cross-examined him extensively about the wanton vandalism which occurred during the house burglaries with which he was charged.[12] The prosecutor also cross-examined defendant concerning his threats of violence toward officers during his prior arrests.
After the defense rested, the state introduced rebuttal testimony to establish the extensive vandalism associated with defendant's prior burglaries and to establish that defendant had previously acted in a hostile manner toward arresting officers.
On appeal, defendant contends that the sentence should be reversed because of the prejudicial effect of the evidence of other crimes for which he has never been convicted. However, the prosecutor did not offer any evidence about defendant's prior acts of misconduct until defendant presented the psychologist's testimony regarding defendant's non-violent propensity. The state's case-in-chief on penalty was submitted solely on the evidence presented in the guilt phase. When defendant's psychologist testified that his opinion was in part based on defendant's lack of history of violent "aggressive" crimes, the state was entitled to challenge that opinion by introducing evidence which tended to establish that the opinion was based on a faulty premise.
In capital cases, the focus of the penalty hearing is on the character and propensity of the accused, as well as on the circumstances surrounding the commission of the specifically intended killing. La.C. Cr.P.Art. 905.2. Defendant's character is at issue. As this court said in State v. Jordan, 440 So.2d 716 (La.1983), "it is the law [La.C.Cr.P.Art. 905.2] which initiates the inquiry into the facts relating to the character of the defendant". 440 So.2d at 719. Of course, there are limits on the type of evidence of other offenses (particularly those of which defendant has not been convicted) which the state may introduce. However, when the defendant himself introduces evidence which makes the nature of his past criminal behavior (whether "violent" or "non-violent") assume particular relevance, the state may delve into the details of defendant's past criminal behavior. See State v. Rault, 445 So.2d 1203 (La.1984).
Capital Sentence Review
La.C.Cr.P.Art. 905.9 requires this court to review every sentence of death for "excessiveness". In reviewing capital sentences, we are guided by Supreme Court Rule XXVIII § 1 and consider the following factors:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
"(b) whether the evidence supports the jury's findings of a statutory aggravating circumstance, and
"(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
(a) Passion, Prejudice or other Arbitrary Factors
Both the victims and the defendant were Caucasian. There was no hint of racial prejudice.
*1169 The prosecutor argued forcefully for the death sentence, but his argument did not exceed the bounds of propriety. See State v. Dupre, 408 So.2d 1229 (La. 1982). Although he briefly alluded to the possibility of defendant's escape, the instant crime was one committed by escapees as part of their effort to illegally gain their own freedom, despite the cost in innocent human lives. The reference to escape, although improper, did not inject a totally irrelevant factor, nor did it create a substantial risk that the death sentence was imposed in an arbitrary, capricious or unfair manner. See California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).
The prosecutor's description of the terror and horror of the victims as they were "waiting on their fate" was not beyond the bounds of appropriate inference-drawing from the facts presented. See State v. Knighton, 436 So.2d 1141 (La. 1983). The victims had been bound and gagged before being shot in the head.
From an independent review of the record, we conclude that the penalty hearing was fairly conducted without the influence of unfairly prejudicial matters or improper, arbitrary factors.
(b) Sufficiency of Evidence of Aggravating Circumstances
In recommending the death penalty, the jury found that the murders were committed during the perpetration of an aggravated burglary, an aggravated escape, and an armed robbery; that defendant knowingly created a risk of death to more than one person; and that the offense was committed in an especially heinous, atrocious or cruel manner. See La.C.Cr.P.Art. 905.4 (a)(d)(g).
As discussed earlier, the evidence clearly establishes the commission of an armed robbery and an aggravated burglary.[13] The evidence also clearly proved that defendant knowingly created a risk of death to more than one person. This aggravating circumstance exists when the offender kills (or intentionally participates in the killing of) more than one person in a single consecutive course of conduct. See State v. Martin, 376 So.2d 300 (La.1979); State v. Sonnier, 402 So.2d 650 (La.1981); State v. Welcome, 458 So.2d 1235 (La. 1984); State v. Glass, 455 So.2d 659 (La. 1984).
When at least one of the aggravating circumstances relied on by the jury is supported by the evidence, a death penalty may stand, even though another aggravating circumstance found by the jury is not to be supported by the evidence, as long as the evidence of the possibly unproved aggravating circumstance did not inject an arbitrary factor into the proceedings. See Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Sawyer, 422 So.2d 95 (La.1982); State v. Celestine, 443 So.2d 1091 (La. 1983). Thus, we need not consider whether the circumstances surrounding this murder were sufficient to establish that the killings were "especially heinous, cruel or atrocious" as defined by this court. See State v. Baldwin, 388 So.2d 664 (La.1980).
(c) Proportionality Review (Assignments of Error Nos. 55 and 84)
Defendant was a 30-year old former police officer who was divorced. He was the father of four children, but did not support them. He had middle range intelligence, and there was no evidence of mental illness. He had a history of abusing alcohol. He had received an undesirable discharge from the army. He had no prior history of convictions for serious crimes. However, prior to the escape which led to the murders, he had been in jail for a series of home burglaries.
Supreme Court Rule XXVIII § 1(c) directs us to compare defendant's sentence to the sentence imposed in similar cases in the judicial district, considering both the crime and the defendant. See State v. Welcome, above.
*1170 Several of the salient features of this case make it similar enough to other death sentences recommended by juries in both the 15th Judicial District (the district to which venue was transferred due to prejudicial publicity in Webster Parish) and in the 26th Judicial District (the district in which the offense occurred) that we are convinced that the jury's verdict was not the "action of an aberrant jury".[14]Gregg v. Georgia, 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976).
In this case, as in State v. Narcisse, 426 So.2d 118 (La.1983); State v. Watson, above; State v. Summit, 454 So.2d 1100 (La.1984); State v. Glass, above; State v. Knighton, 436 So.2d 1141 (La.1983); and State v. Moore, 414 So.2d 340 (La.1982), the jury was presented with an intentional killing of an innocent victim during the perpetration of an armed robbery. Moreover, these murders, as in Narcisse, Glass, Moore and Celestine, involved the murder of a person by an intruder who violated the sanctuary of the victims' own home, a particularly terrifying sort of crime to decent, lawabiding people. On the other hand, the cases in which the jury recommended life imprisonment involved either domestic or barroom disputes, mental illness, or other significant mitigating factors. A more detailed discussion of the cases in which juries in the 15th and 26th Judicial Districts made sentencing recommendations after returning verdicts of first degree murder is contained in the unpublished appendix.[15]
Additionally, as we noted earlier on rehearing in State v. Welcome, above, juries throughout this state have generally recommended the death penalty when two or more persons were actually killed in a single act or a single consecutive course of conduct. See Appendix A, State v. Welcome, above; State v. Celestine, above.
Furthermore, the death sentence in the present case is in no sense inherently disproportionate or "excessive" (and therefore "cruel and unusual") in consideration of the nature of the crime itself or the circumstances under which it was committed. See Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). Defendant and his confederate Glass invaded the sanctuary of the home of two innocent human beings who had done nothing to provoke, facilitate or encourage defendant's crime. They viciously took the lives of their helpless, bound victims solely for the purpose of avoiding detection in order to facilitate their own unlawful flight from custody. This kind of crime reveals a criminal mind disposed toward behavior which suits the criminal's own purpose without regard to the pain and suffering of others. Defendant's actions in this case reflect a depraved indifference to human life and merit the severest condemnation and penalty which the law provides.
Defendant contends, however, that Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), prohibits the imposition of the death penalty on one who was not the triggerman. Counsel misreads that decision. In Enmund, the defendant was convicted under a first degree murder statute which included felony murders and did not require specific intent. The record showed only that the defendant aided and abetted in a robbery, in the course of which the victims were killed, by waiting in a car several hundred feet away. The Supreme Court concluded that the death penalty was excessive punishment in the absence of proof that the accused killed, attempted to kill, or intended that a killing take place, and the case was remanded.
*1171 In Louisiana, the state must prove specific intent to kill or inflict great bodily harm in order to obtain a conviction of first degree murder, before the jury can even consider the death sentence.[16] As discussed earlier, the overall evidence in this case supports the jury conclusion that defendant had the specific intent to kill and actively participated in the crimes.
We therefore conclude that the magnitude and viciousness of the crime and lack of strong factors in mitigation reasonably led the jury to recommend death rather than life imprisonment.
For the reasons assigned, defendant's conviction and capital sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La. R.S. 15:567 until (a) defendant fails to petition timely the United States Supreme Court for certiorari, (b) that court denies his petition for certiorari, or (c) further orders of this court.
DIXON, C.J., concurs.
WATSON, J., joins in the majority opinion and adds additional reasons.
CALOGERO, J., concurs and assigns reasons.
DENNIS, J., concurs with reasons.
WATSON, Justice, concurring and assigning additional reasons.
While I join in the reasoning and result of the majority opinion, I would also hold that the murder of this helpless elderly couple was especially heinous, atrocious and cruel, the third aggravating circumstance found by the jury. LSA-C.Cr.P. art. 905.4. Being awakened, bound, gagged, and executed in succession at approximately 1:51 A.M. in the sanctity of their bedroom must have made the victims' last moments particularly horrible, despite the fact that no physical torture was inflicted.
CALOGERO, Justice, concurring.
I concur in the majority opinion in this case. However, I feel constrained to point out that nothing therein should be interpreted as a finding by this Court that the state can introduce, in its case-in-chief during the penalty phase of the trial, under La.C.Cr.P. art. 905.2, evidence of defendant's prior bad acts.
In the instant case, a clinical psychologist was called to the stand as a defense witness. He testified that it was his opinion that defendant was a non-violent person. He stated that he based his opinion on the defendant's admissions to him that his only previous criminal activity consisted of non-violent burglaries. At that point, the state cross-examined this witness on the accuracy of the information upon which he based his opinion, and introduced evidence to correct that less than accurate information. Thus, the only question presented in this case for our consideration is whether the details of crimes the defendant is charged with but has not been convicted of (the burglaries) can be presented after the defendant has put his character at issue and admitted his perpetration of the charged offenses. The majority answers this question affirmatively and I am in accord with that determination.
However, that does not mean that a majority of this Court has made a determination that such evidence, that is, evidence of defendant's bad acts as opposed to prior convictions, could be admitted in the state's case in chief under La.C.Cr.P. art 905.2 and jurisprudence relative thereto which has held that that provision "initiates the inquiry into the facts relating to the character of the defendant." State v. Jordan, *1172 440 So.2d 716 (La.1983).[1] This Court has only held that prior convictions of the defendant are so admissible and has not extended that holding beyond prior convictions to simply evidence of bad acts. In view of the fact that the issue presented in this case does not require such an extention, I concur in the majority opinion.
DENNIS, Justice, concurring.
I respectfully concur.
Although I agree that the evidence was sufficient to support the conviction, I do not approve of the majority's suggestion that the defendant must show that there is a "compelling hypothesis" in order to successfully attack the conviction under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Contrary to the majority opinion, I adhere to the view regarding La.C.Cr.P. article 905.2 and character evidence in capital sentencing proceedings that, except for evidence relative to aggravating and mitigating circumstances, the introduction of character evidence is governed by the rules of evidence. See State v. Sawyer, 422 So.2d 95, 106 (La.1982) (Dennis, J., concurring in the result).
Finally, I disagree with the majority opinion's indication that the purpose of comparing the defendant's death sentence to the sentences of other defendants is to determine whether the jury's verdict of death was the "action of an aberrant jury." Whether a sentence is proportionate in terms of the nature of the offense, the propensities of the offender, and other comparable offenders and offenses is necessarily a question to be considered directly in excessiveness review under our state constitution. State v. Brogdon, 457 So.2d 616 (La.1984); State v. Lathers, 444 So.2d 96 (La.1983); State v. Telsee, 425 So.2d 1251 (La.1983); State v. Sepulvado, 367 So.2d 762 (La.1979).
NOTES
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is a part of the official record.
[2] Both Ms. Hill and Whittington testified at trial as witnesses for the prosecution. Much of the recitation of facts is taken from their testimony.
[3] He was eventually captured by police in California.
[4] Defendant was not wearing a cap when he escaped from jail. Ms. Hill testified that the label which defendant removed from the cap he was wearing was the same as the label on a cap produced by the victims' son-in-law.
[5] Glass was convicted and sentenced to death after a trial in which he admitted shooting both victims, but claimed to have done so only because Wingo threatened to kill him if he did not. However, when called by the state at defendant's subsequent trial, Glass refused to testify. Thus, defendant's jury was not informed of Glass' testimony or his prior confession.
[6] The trial judge wisely appointed two attorneys to represent defendant in this capital case. The attorneys divided the responsibility for preparation and presentation of the defense, one handling the guilt phase and the second handling the sentencing phase. Defendant thus received a thorough and well-prepared defense on the penalty issue, and this case does not present the frequently occurring problem of ineffective assistance of counsel at that stage of the proceeding. As this court suggested in State v. Fuller, 454 So.2d 119 (La.1984), such a problem is perhaps caused, at least in part, by the natural tendency (in cases of appointment of a single attorney) to concentrate on preparation for the guilt phase and to suffer a let-down when that defense is unsuccessful.
[7] In this case, the guilt phase issue involving specific intent is closely related to the penalty phase issue pertaining to the mitigating circumstance that "[t]he offender was a principal whose participation was relatively minor". La. C.Cr.P.Art. 905.5(g).

La.R.S. 14:30 requires the state to prove that the accused had the specific intent to kill or inflict great bodily harm in order to obtain a conviction of first degree murder in the guilt phase of the bifurcated capital trial. Not until this is proved is defendant even eligible for consideration for the death penalty. Contrast Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which involved a state statute under which the accused could be convicted of first degree murder without proof that he had the specific intent to kill. (See further discussion of the Enmund case in the section of this opinion on excessiveness of sentence.) Under that type of statute, the role of the accused in the overall crime is a particularly important consideration in the penalty phase.
[8] This comment was of critical significance because it explained the absence of defendant's fingerprints in either the Browns' house or automobile where Glass' prints were found. It is also significant that the dresser drawer was dumped by someone wearing gloves and that Glass left fingerprints in the house and on the car, indicating that he did not wear gloves that night.
[9] Defendant does not challenge the manner in which the trial court applied Article 798 in granting challenges for cause as to particular jurors.
[10] Defendant also complained that the prosecutor's remarks about his escape from jail were impermissible references to other crimes. However, the escape and the ensuing crimes at the Browns' home (by which defendant obtained money, clothes and transportation to make good his escape) formed one continuous transaction, and the trial judge correctly ruled that events which form part of the res gestae are always admissible. See La.R.S. 15:447.
[11] In the Glass trial, the prosecutor commented in closing argument that he was "not here to defend Wingo", but emphasized that Glass admittedly broke into the home, stole money, armed himself and shot the victims. He also commented that the photographs of the scene showed no wrenches in the home.
[12] Defendant was in jail awaiting trial on these burglaries when he escaped.
[13] Thus, we need not decide whether this evidence also established an aggravated escape.
[14] Although Supreme Court Rule XXVIII § 4 requires us to conduct a comparative proportionality review based on first degree murder cases "in the district in which sentence was imposed" (emphasis added), we have, for the sake of completeness, also considered cases in the district in which the offense was committed.
[15] Although Supreme Court Rule XXVIII § 4 is unclear on the precise scope of the sentence review memorandum to be filed by counsel, we include in our discussion only those cases in which the defendant was convicted of first degree murder, because those are the only cases in which juries exercise sentencing discretion.
[16] The Enmund case was a proportionality decision. (Arguably, under Louisiana, Law, the evidence in Enmund may not have supported a conviction of first degree murder.) The only pure proportionality decision in Louisiana under the post-1976 statute is State v. Sonnier, 380 So.2d 1 (La.1979), in which the death penalty was set aside because defendant's participation was relatively minor and his brother's influence and domination were so significant that defendant otherwise would not likely have participated in the murders.
[1] The holding in Jordan, with which I concurred, was that prior convictions of the defendant's could be admitted in the State's case-in-chief, under La.C.Cr.P. art. 905.2. However, I did so, noting that the issue had previously twice been decided by a majority of the Court. State v. Sawyer, 422 So.2d 95 (La.1982); State v. Mattheson, 407 So.2d 1150 (La.1982).