**Jimmy C. WINGO, Petitioner-Appellant,**

v.

**Frank BLACKBURN, Warden,
Louisiana State Penitentiary,
Respondent-Appellee.**

**No. 85–4580.**

United States Court of Appeals,
Fifth Circuit.

Feb. 24, 1986.

Rehearing and Rehearing En Banc
Denied April 4, 1986.

Robert Selcov, Ward J. Oliver, Poughkeepsie, N.Y., Stephen M. Latimer, East Brunswick, N.J., F. Ray Mouton, Jr., Lafayette, La., for petitioner-appellant.

Henry N. Brown, Jr., Dist. Atty., 26th Judicial Dist. Court, Benton, La., for respondent-appellee.

Before GEE, REAVLEY and HILL, Circuit Judges.

REAVLEY, Circuit Judge:

Jimmy C. Wingo has been convicted and sentenced to death in the courts of Louisiana for the murders of Newton and Erline Brown on Christmas Day of 1982. *See State v. Wingo*, 457 So.2d 1159 (La.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2049, 85 L.Ed.2d 322, *reh'g denied* —— U.S. ——, 105 S.Ct. 2691, 86 L.Ed.2d 708 (1985). The federal district court denied Wingo's petition for habeas corpus. We granted certificate of probable cause, and after consideration of the briefs and oral argument of counsel, and study of the state record, we affirm the denial of habeas corpus.

I.

On Christmas Eve about 8:00 p.m. Wingo escaped from the jail in Minden, Louisiana, where he had been confined under burglary charges. Accompanied by another escapee, Jimmy Glass, he avoided the roads and walked several miles along railroad tracks to the Brown home. The next day the bodies of Mr. and Mrs. Brown were found in their bed, gagged and bound at the hands and feet. Both had been killed by gunshots to the back of their heads. Their house had been ransacked. Entry had been made through a broken glass patio door.

At daybreak on Christmas, Wingo arrived at the home of his sister, Betty Whittington, in Vivian, Louisiana. He had cash, clothing, weapons, and ammunition taken from the Brown home. The Brown's Lincoln automobile was later found, stalled in high water on the road, a quarter of a mile from the Whittington home. Accompanied by Glass and Gwen Hill, Wingo's girlfriend, he then drove a Datsun pickup into East Texas. Wingo and Hill were captured in woods near Atlanta, Texas, on January 5, 1983. Glass was apprehended in California. Wingo and Glass were indicted on two counts of first degree murder. Glass was tried first, convicted on both counts, and sentenced to death. Wingo was also convicted and sentenced to death for both murders.

Diligent counsel for Wingo attack the constitutionality of the conviction and death sentence on 10 grounds. We will address each ground.

II. THE ENMUND CLAIM

In *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the Supreme Court held that the Eighth Amendment barred the imposition of the death penalty "in the absence of proof that [the defendant] killed or attempted to kill, and regardless of whether [he] intended or contemplated that life would be taken...." *Id.* at 801, 102 S.Ct. at 3378–79. Wingo argues that, as in Enmund's case, in the absence of proof that he participated or intended the murders of Mr. and Mrs. Brown, it cannot be said that the death penalty is proportional to his conduct. We are cited to our opinion in *Jones v. Thigpen*, 741 F.2d 805 (5th Cir.1984), where we granted writ because of the absence of proof of the culpability of Jones that was required by the Court in *Enmund*.

Both Enmund and Jones were convicted of felony murder crimes not requiring proof that the defendant shared any culpability for the homicide except that he participated in the felony underway when a confederate did the killing. Wingo, however, was convicted of first degree murder under the Louisiana law which requires proof of specific intent to kill or inflict great bodily harm. The jury was so instructed and found that Wingo did have that specific intent. The Supreme Court of Louisiana upheld the conviction at that point and wrote:

The jury had ample circumstantial evidence from which to reasonably conclude that defendant was with Glass in the bedroom where the murder occurred. He escaped with Glass shortly before from a nearby jail. Like Glass, he had a

pressing motive to steal money (both were penniless), clothes (both had only jail outfits), transportation (both were seeking to flee the area), and weapons (both vowed not to be "taken alive"). He and Glass appeared together at his relatives' home shortly after the crime with clothes, guns, and money which were identical or very similar to items stolen during the break-in at the Browns' home. He and Glass made statements that they had "robbed" a house to secure the money and guns. He and Glass took a vehicle from his relatives without their consent and continued their flight to Texas. When defendant found that he was being hunted in connection with the murders, he fled into the woods, where he concealed various items which could be identified with the Browns' home. Upon being captured, defendant had a pair of gloves in his possession which matched the fabric print made by a glove on a ransacked dresser drawer in the Browns' home, and he made a highly incriminating statement ("I always wear gloves when I commit a crime") to an arresting officer. Finally, a fiber found on pants left by defendant at the Whittingtons' home matched the fiber of a blanket on the Browns' bed where the bodies were found.

Because Glass refused to testify and defendant elected to exercise his constitutional right not to testify, there was no direct evidence (in the guilt phase) of defendant's role in these crimes. Nevertheless, a rational juror, viewing the overall evidence in the light most favorable to the prosecution, could have concluded beyond a reasonable doubt that defendant actively participated in the killing of the victims (whose deaths were obviously purposefully inflicted). *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Given the evidence presented, it was certainly reasonable for the jury to conclude that defendant's role was that of an equal partner in all of the crimes committed by the two during this episode, including the murders. The theory that Glass (who

was significantly smaller than both defendant and Mr. Brown) broke in alone and overpowered the Browns while defendant waited outside, unaware that Glass would kill the helpless victims, is simply not a compelling hypothesis, and the jury acted reasonably in rejecting it. See *State v. Captville*, 448 So.2d 676 (La.1984); *State v. Chism*, 436 So.2d 464 (La.1983); *State v. Sutton*, 436 So.2d 471 (La.1983).

457 So.2d at 1164–65 (footnote omitted).

Because the state court has found the requisite culpability to satisfy *Enmund*, the finding is presumed to be correct by virtue of 28 U.S.C. § 2254(d) (1982) and *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), *Cabana v. Bullock*, —— U.S. ——, ——, 106 S.Ct. 689, 698, 88 L.Ed.2d 704 (1986). We are in agreement with the Supreme Court of Louisiana and conclude that the finding is fairly supported by this record. See 28 U.S.C. § 2254(d)(8). To what the Louisiana court wrote we add that the jury had every reason to conclude that Wingo was the dominant figure in this twosome and that nothing was done that night without his approval and participation. He was a former policeman, a large man. He initiated the jailbreak because he had been denied a visit from Gwen Hill (the mother of his child) when his sister's husband, Frank Whittington, failed to bring Hill from Vivian to Minden on the previous day. Jimmy Glass was a small man, only 20 years old. Wingo's participation in the attack in the Brown bedroom is quite clear. Newton Brown was a large and active man, 55 years old. He had a pistol in his closet. A very protective Dalmatian dog was in the bedroom. Brown's body had wounds on his elbow and abrasions on his knuckles. To subdue him, ward off the dog, and tie the victims was far more than Glass could have accomplished alone.

After the murders Wingo remained the dominant figure. He drove the Brown car to Vivian, not to Glass' desired destination. He arrived at his sister's home announcing that he was going to kill Frank Whitting-

ton and had to be dissuaded by Gwen Hill. He left saying that he would not be taken alive, an understandable statement for one guilty of vicious murder but hardly the expected posture of a mere burglar. We cannot fault the state finding that Wingo intentionally participated in the murder of Newton and Erline Brown.

## III. THE COURT'S INSTRUCTION ON SPECIFIC INTENT

■ Wingo contends that the jury was not adequately instructed that, in order to find this defendant guilty, they would have to find that he had the specific intent to kill, irrespective of the intent of Glass and the fact that the two of them participated in the burglary. To support this argument petitioner's brief quotes two statements made by the prosecutor during the jury selection. Because the prosecutor referred to the law of principals, whereby all principals are equally guilty of the offense that they may commit, Wingo argues that as in *Clark v. Louisiana State Penitentiary,* 694 F.2d 75 (5th Cir.1982), *reh'g denied,* 697 F.2d 699 (1983), the prosecution was relieved of its burden in violation of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

This record allows no possibility that the jury in this trial could have misunderstood the burden of the state in this respect. They were repeatedly told that they could not find Jimmy Wingo guilty of first degree murder unless he was proved to have intended to kill. The trial judge told them this on many occasions, and the final instruction at the guilt stage made no mention of the law of principals. Neither *Enmund* nor *Mullaney* impose a constitutional requirement that the instruction on specific intent be repeated at the sentencing stage.

## IV. INEFFECTIVENESS OF COUNSEL

■ Wingo argues that he was denied the constitutional level of assistance of counsel. To this end he must show that his counsel's performance was deficient and that the deficiency prejudiced the defense

so as to deprive him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is no such showing. A motion for mistrial because of the opening remarks of the prosecutor would have been fruitless. Contrary to Wingo's contention, the defense attorney did move for full disclosure of the state's evidence prior to trial and obtained that information.

Wingo urges that defense counsel should have prevented Jimmy Glass from making a statement in the presence of the jury. Apparently the prosecutor thought that Glass would testify that he shot the Browns under compulsion from Wingo. After being called to the witness stand by the state, Glass responded to a few questions of identification and then refused to answer any further, saying: "I don't feel like I should be up here telling my story that during my trial you said was a lie, yet you want me up here to tell it now so you can convict that man over there [demonstrates toward defendant]." It is difficult to see how this statement by Glass could have harmed Wingo. The defense attorney could have reasonably anticipated the effect to be an adverse reflection against the prosecutor. The contention here is that Glass' statement tended to give credence to the prosecutor's opening statement to the effect that Wingo directed Glass to do the shooting. To argue that this episode had any effect on the jury is farfetched. The evidence pointed to Wingo as the director of this criminal venture. If anything, a suggestion of Glass' participation more likely favored Wingo. We fail to find any deficiency on the part of defense counsel. Their conduct of this defense was tenacious and thorough, by no means deficient.

## V. OTHER GROUNDS

1. *Batson v. Kentucky (unpublished opinion) (Ky. Dec. 20, 1984),* cert. granted, —— U.S. ——, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985).

■ The prosecutor used preemptory challenges to remove three blacks from the

jury venire. Without pointing to any ruling by the state trial judge or any defense effort to prove discriminatory intent at this trial or as long-standing policy, the petitioner now says that he was denied a representative jury, in violation of the Sixth, Eighth and Fourteenth Amendments, and cites *McCray v. Abrams,* 750 F.2d 1113 (2d Cir.1984). Jimmy Wingo, Jimmy Glass, and Mr. and Mrs. Brown were all white. There is no factor of race in this case. No issue of constitutional defect is raised by the prosecution's exercise of three preemptory challenges. *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

### 2. *A lack of aggravating circumstance.*

■ The jury found that the killings were committed during the perpetration of an aggravated burglary, an aggravated escape and an armed robbery. Wingo argues that since that circumstance was an essential element of first degree murder itself, there must be additional aggravating circumstances found in order to distinguish this case from others in which the death penalty was not imposed. That would mean that this is an arbitrary death sentence and violative of the Eighth and Fourteenth Amendments. They cite the Eighth Circuit's decision in *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). The jury also found that the defendant knowingly created a risk of death to more than one person, another aggravating circumstance. We fail to see why aggravating circumstances narrow the sentencing discretion any less by being made a constituent element of the crime. The State of Louisiana is entitled to authorize capital punishment for persons guilty of these aggravated acts where the jury does not find that mitigating circumstances justify less than the death penalty. *See Gray v. Lucas,* 677 F.2d 1086 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983).

### 3. *Instructing the jury on its options.*

■ Wingo claims that the jury was not told that it was entitled to reject the death penalty irrespective of their finding of mitigating circumstances. The breadth of their choice was explained to the jurors. While they were instructed to consider the statutory aggravating and mitigating circumstances, they were told that they could "consider any other relevant circumstance or circumstances which you feel should mitigate the severity of the penalty to be imposed." They were also told that it was their "duty to consider the circumstances of the offense and the character and propensities of the defendant in determining sentence to be imposed."

### 4. *Discriminatory Treatment of Parties on Special Charges.*

■ The trial court enforced its rule requiring that parties requesting the submission of special charges to the jury should supply the court with those charges in writing prior to the time of the closing argument. Wingo says that the judge did not treat the district attorney and defense attorneys equally in this respect. We find no unevenness. The trial court had erroneously charged the jury that it was necessary to find that Wingo himself had done the killing in order to convict him. Upon request of the prosecutor, the jury was recalled and told that Wingo could be found guilty if he was concerned in the killing without doing the actual shooting, and again, at the request of the defense, that guilt depended upon a finding of specific intent to kill.

### 5. *Sequestered Voir Dire.*

■ The trial court denied a defense motion to question the potential jurors individually. They were brought to the courtroom 12 at a time and questioned. This trial was transferred to Lafayette on a change of venue and no problem of prospective juror bias because of excess publicity arose during the selection of the jury. Nothing appears in the record and no argu-

ment is now made to point to any need for individual interrogation.

### 6. *Discriminatory Administration of Louisiana Death Penalty Statute.*

■ Wingo asked for a hearing on his claim that the probability of execution is greater where the victim of a crime is a white person, and therefore that there may be racial discrimination in the imposition of the penalty. The Supreme Court of Louisiana made a proportionality review and the conclusory argument that there is a racial component raises no cognizable claim. *Moore v. Maggio,* 740 F.2d 308 (5th Cir. 1984), *cert. denied* — U.S. —, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985).

### VI. THE GRIGSBY CLAIM

■ Finally, Wingo makes the argument that the exclusion of potential jurors under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), subjects the accused to a jury panel unfairly biased on the issue of guilt, as was held in *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.), *cert. granted sub nom. Lockhart v. McCree,* — U.S. —, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985). This contention is contrary to the writing of the Court in *Witherspoon* where it was stated:

> [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case.

*Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). The Court was speaking here of a single jury and not a separate jury for determining guilt and another for deciding punishment. If that were necessary, the state would be required to hold two virtually complete trials in order to enforce a crime providing for capital punishment. We do not think the Constitution requires this. *Rault v. Louisiana,* 772 F.2d 117 (5th Cir. 1985); *Watson v. Blackburn,* 756 F.2d 1055, 1056–57 (5th Cir.1985).

The district court's judgment denying writ of habeas corpus is affirmed. Because the Supreme Court has now under consideration the *Grigsby* issue and has consistently stayed the execution of sentence in all pending petitions for habeas corpus raising that issue, the issuance of our mandate and the execution and enforcement of the sentence against Jimmy Wingo are stayed for 30 days following this date to allow for petitioner to seek writ of certiorari. In event a petition for writ of certiorari is filed within that time, this stay will continue until the Supreme Court denies certiorari, or sends its judgment to this court, or until further order of the Supreme Court.

AFFIRMED.