524 So.2d 1176 (1987)
STATE of Louisiana
v.
Tracy LEE.
No. 86-KA-0552.
Supreme Court of Louisiana.
November 30, 1987.
On Rehearing May 23, 1988.
*1177 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Stephen Mike Henry, Dist. Atty., for plaintiff-appellee.
C.R. Whitehead, Jr., Robert L. Salim, Kelly & Salim, Natchitoches, Dennis B. Schlenker, Feit & Schlenker, Albany, N.Y., Richard C. Guerriero, Faria and Guerriero, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of death. The principal issues on appeal involve the trial court's rulings on a motion to suppress evidence seized from defendant's car and from his quarters in military barracks and on a motion to suppress his confession to the crime and evidence derived *1178 from that confession.[1] After considering every assignment of error, including those abandoned or not argued on appeal, and after making an independent review of the record, we affirm the conviction and sentence.
The crime was committed by a masked intruder who entered the residence of Marjorie Blackston and killed one occupant, raped two others and took cash from the victims. Thus, there is no dispute that there was a specifically intended killing during the perpetration of an aggravated rape, an aggravated burglary, and an armed robbery. The only disputed element of the prosecution's case in the guilt phase of the trial was whether defendant was the masked intruder who committed the first degree murder.
Facts
At about 10:00 p.m. on June 15, 1985, an intruder unscrewed the bare light bulb on the back porch of the Blackston residence in Natchitoches and entered through the unlocked rear door.[2] He grabbed Mrs. Blackston's eighteen-year old daughter, Chandra, in the kitchen and stuck a gun in her face. He then shot Chandra's fifteen-year old brother, Rohn, in the face and forced Chandra and her mother into a bedroom. When Mrs. Blackston begged that she be allowed to look after her wounded son who was trying to raise himself from the floor, the assailant went back into the kitchen and shot the boy in the back of the head.
The assailant returned to the bedroom and struck Mrs. Blackston on the head several times. He then proceeded to rape each of the women twice and to force Chandra to perform oral sex on him. Following the rapes, he squirted Old Spice cologne on his victims. He also took $45.00 in cash (two $20.00 bills and five $1.00 bills) from Chandra. After tying up the women with electric cords and wiping his fingerprints from the appliances and fixtures he had handled in the house, the assailant left.
The Blackstons immediately reported the incident to the police. They described the assailant as being five feet, seven inches tall, weighing 130 to 145 pounds, and wearing blue jean shorts, a dark shirt, white tennis shoes, a wave cap on his head, and a military mask on his face. They further informed the police that the assailant reeked of alcohol.
Several hours later, Lieutenant Keith Thompson of the Natchitoches Police Department received a call from Lisa Metoyer, defendant's former girlfriend. Metoyer had been told of the murder by a friend who heard the description of the murderer on the police radio. Because the description of the murderer and his clothing matched that of defendant and because defendant had been at her mother's house, around the corner from the Blackston's residence, shortly before the time of the murder, she suspected that defendant may have committed the crimes.
Besides furnishing Lieutenant Thompson with defendant's name and the fact that he was in the military service stationed at Fort Polk, Metoyer confirmed that defendant's approximate height and weight was five feet, seven inches and 160 pounds. She further related that defendant had worn blue jean shorts, a dark blue sweatshirt, white tennis shoes with black stripes, and a wave cap on his head. She also informed Thompson that defendant kept a gun in his car, had a strong odor of alcohol when he came to her apartment at about 8:30 that evening, had choked her and attempted to remove her clothing but left when someone drove into the driveway, and called her later from her mother's house.
Lieutenant Thompson, after trying unsuccessfully to contact a local judge to obtain an arrest warrant, telephoned Special Agent Lewis Byers of the Criminal Investigation Command (CIC) at Fort Polk. Byers ordered the military police to keep *1179 defendant under surveillance. When defendant attempted to leave Fort Polk at around 6:00 a.m. in a hasty manner, Byers feared defendant was trying to flee and ordered the military police to stop him. Upon being stopped, defendant consented to a search of his automobile. The military police found a live round of .25 caliber ammunition, the same caliber bullet which had been fired from the murder weapon.[3] A subsequent search of defendant's person yielded two rolls of bills, one of which consisted of two $20.00 bills and five $1.00 bills.
A search of defendant's quarters in the barracks, authorized by defendant's commanding officer, yielded a black shirt, blue jean shorts with the scent of cologne, and a towel with semen stains.
After defendant's arrest, the military authorities advised him of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant exercised his right to remain silent until he spoke to an attorney. The questioning by the military authorities thereafter ceased.
Defendant was again advised of his constitutional rights when he was picked up by the Natchitoches police. He again stated that he understood his rights, but did not want to talk. Upon his arrival at the police station in Natchitoches at 11:27 p.m. on June 16, defendant was again advised of his constitutional rights, and he indicated that he did not wish to talk to the police and did not want an attorney.
After a series of events to be described in further detail later in this opinion, defendant gave an audiotaped statement at 1:13 a.m. on June 17, describing entirely the details of the burglary, rapes and murder. When the police determined that this taped confession was inaudible in many parts, defendant agreed to and did give a second detailed confession the same afternoon. In both confessions, he admitted that he had disposed of the gun, tennis shoes, cap, mask and bullets along Louisiana Highway 1 between Natchitoches and Fort Polk. Later in the day, defendant accompanied the police and pointed out the area along the highway where he had disposed of the items. The police recovered the items, and the gun proved to be the murder weapon.
After a hearing on the motion to suppress the seized evidence and the two confessions, the trial judge granted the motion to suppress the first confession and denied all other motions. In the guilt phase of the bifurcated trial, the prosecution introduced the second confession and all of the seized evidence. A fingerprint expert established positively that a fingerprint lifted from the light bulb on the Blackstons' porch was defendant's. The jury unanimously returned a verdict of guilty of first degree murder.
In the penalty phase, defendant testified and confirmed all of the details of the crime. He discussed stress factors such as his uncontrolled loss of hair, his fear that he had herpes, and the end of his relationship with his girlfriend. He admitted that he had tried to conceal his identity and to cover his tracks, but had been unable to find one of the bullet hulls and had forgotten about the fingerprints on the lightbulb. He also admitted that he had lied to the psychiatrist on the sanity commission so that the doctor would think he was crazy. The jury unanimously recommended the death sentence, finding as aggravating circumstances which had been proved beyond a reasonable doubt that the offender was engaged in the perpetration of an aggravated rape, an armed robbery, and an aggravated burglary, the offender knowingly created a risk of death or great bodily harm to more than one person, and the offense was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr. P. art. 905.4(a), (d) and (g).
The matter is now before the court under the automatic appeal mandated by La.C.Cr. P. art. 905.9.
*1180 Suppression of Evidence (Assignments Nos. 4 and 5)
Defendant contends that the .25 caliber shell found in his car and the $45.00 in cash taken from his trousers should have been suppressed because the military police illegally apprehended and detained him as he was leaving the base. He argues that there was no reasonable suspicion for an investigatory stop or probable cause for an arrest. He further argues that the illegal stop tainted his consent to search the car, as well as the later inventory of the pockets in his trousers.
When defendant attempted to leave the military base at a high rate of speed early in the morning following the murder, the military police forcibly detained and handcuffed him. Special Agent Byers, who had been contacted by Natchitoches Police Lieutenant Thompson, advised defendant that Thompson would file charges against him in connection with the murder.
During this confrontation, Byers saw the .25 caliber shell on the floorboard of the car and obtained defendant's permission to search the car and impound it. Byers then removed defendant to CIC headquarters, where an inventory of his personal belongings yielded the $45.00 in cash. In the meantime, Byers removed the live shell from the car pursuant to defendant's consent, but the subsequent search of the impounded car yielded no further evidence.
The police in one jurisdiction are entitled to act on an alert bulletin issued by the police in another jurisdiction which is based on probable cause. See United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Lieutenant Thompson clearly had probable cause to arrest defendant when he issued the bulletin to the authorities at Fort Polk. Thompson knew from interviewing the murder victim's relatives, who had first knowledge of the facts, that the murderer was black, stood about five feet seven inches tall, weighed 130 to 145 pounds, reeked of alcohol, and wore a wave net cap, black shirt, blue jean cut-offs and tennis shoes with black stripes from the laces to the soles. He also knew from interviewing defendant's former girlfriend that defendant was black, stood about five feet seven inches tall, weighed about 145 to 150 pounds, smelled of alcohol, and on the night of the murder was wearing a wave net cap, a dark blue sweatshirt, cut-off jeans and tennis shoes with stripes from the laces to the soles. He further knew that defendant had been rebuffed in his sexual assault on the girl and had gone to the girl's mother's home near the Blackstons' residence shortly before the time of the murder. Thompson therefore had knowledge of sufficient facts and circumstances based on trustworthy information to justify the belief that defendant had committed the crime under investigation.[4]State v. Bell, 395 So.2d 805 (La.1981). The exigent circumstances of defendant's apparent attempt to flee the military base justified stopping defendant's vehicle before a warrant could be obtained. State v. Edsall, 385 So.2d 207 (La.1980). Therefore, there was no illegal police conduct which tainted defendant's consent to search his vehicle or the subsequent inventory of defendant's personal belongings.
Defendant next contends that the cut-off shorts with the fragrance of cologne and the towel stained with seminal fluid, which were seized in a search of his quarters in the barracks, should have been suppressed. He argues that the search, authorized by his commanding officer after being presented with the warrant obtained by Lieutenant Thompson to search defendant's car, was illegal because Thompson's affidavit contained misrepresentations and the application for the warrant was signed only by an unidentified policeman.
The signature of the policeman on the warrant, which was issued on the basis of Thompson's affidavit, was explained by the fact that the warrant was issued in a parish where Thompson had no authority to act. Thompson and the local officer appeared *1181 together before the judge who issued the warrant.
As to the allegations of misrepresentations in the affidavit, Thompson's affidavit and the testimony of defendant's former girlfriend varied on two significant points.[5] Thompson stated in the affidavit that the girlfriend said defendant was wearing a "black shirt", while the girl testified she told Thompson defendant was wearing a dark blue sweatshirt with red writing. Thompson's affidavit also stated that the girlfriend told him defendant owned a ".25 cal. semi-automatic, silver in color with wooden handles", while the girl testified she didn't know anything about the caliber of weapons and had simply described the gun to Thompson as a "silver hand gun with brown handles". In each case, the information in the affidavit was a closer match to the information obtained from the victim's family, thereby strengthening the showing of probable cause.
The defense did not establish any basis for a conclusion that Lieutenant Thompson deliberately attempted to mislead the judge who issued the warrant.[6] Moreover, the variations were not so obviously fabricated for that purpose that this court should draw that inference.[7] The variations were evidently inadvertent or negligent, and when the affiant makes a negligent misrepresentation, the reviewing court should simply delete the misinformation and retest the sufficiency of the remaining facts to establish probable cause. State v. Rey, 351 So.2d 489 (La.1977).
Here, when the arguable misinformation is stricken from the affidavit, there is still sufficient probable cause for the issuance of the warrant. The general match of the descriptions given by the victim's family and by defendant's former girlfriend, combined with the fact of defendant's presence in the area of the murder following a sexual assault on his former girlfriend, was sufficient for the judge to make a practical commonsense determination that there was a fair probability that evidence of a crime would be found in the particular place to be searched. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
Suppression of Confession and Derivative of Evidence (Assignment No. 1)
Defendant contends that his confession and the evidence derived from that confession were obtained illegally and should have been suppressed. He argues that the police, after he had invoked his right to counsel, violated the rule of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), by continuing custodial interrogation and by utilizing procedures calculated to break down his determination not to speak about the murder until he consulted an attorney.
In the Edwards case, the accused, after denying involvement in the crime upon arrest and giving an alibi, sought to make a deal. He then told the police that he wanted an attorney before making a deal. When two detectives visited the jail the next morning, the accused stated that he did not want to talk to anyone, but was told he had to talk. He then gave an inculpatory statement. A unanimous court ruled that the confession was invalid. The majority held that when an accused has invoked his right to have counsel present during custodial interrogation, he is not subject to further interrogation until a lawyer is made available unless the accused *1182 himself initiates further communication, exchanges or conversation with the police.[8]
In the present case, defendant was detained by the military police at about 6:30 a.m. on June 16, 1985. When defendant arrived at CIC headquarters at 7:20 a.m., Agent Byers informed him of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant invoked his right to remain silent and indicated on a rights form that "I want a lawyer". The military authorities did not conduct any further interrogation.
While defendant was being detained in an office at headquarters, he seized a pair of scissors and attempted to cut his wrist. The authorities took him to a hospital, but he refused sutures. He was then returned to headquarters and placed in a holding cell.
At about 9:00 p.m., the Natchitoches City Police arrived and took over defendant's custody. They advised him of his rights when he was taken from his cell at the base and again when he was placed in the car to be transported to Natchitoches. Before they left the base, Agent Byers advised Lieutenant Thompson that defendant had requested an attorney.
Upon his arrival in Natchitoches at 11:27 p.m., defendant was again advised of his rights, but again declined to talk about the crime. Lieutenant Thompson and Ronald Dove, an investigator for the district attorney, then began the booking process and proceeded to take fingerprints and to prepare an arrest report. At no time did defendant indicate that he wanted a lawyer, although Dove encouraged him to contact a lawyer or his family because of the seriousness of the matter.
During the process, Thompson and Dove conversed with defendant about his home and his military service. Thompson told defendant they weren't hiding anything from him and that the evidence was there on the floor of the office. Dove wondered rhetorically if there had been any similar crimes at the military bases where defendant was previously stationed. When the booking process was completed and defendant "started talking to us more freely", Thompson produced a picture of the murder victim and asked defendant "why would he shoot this young boy". Defendant stated that he had never done anything like that before and asked what they wanted to know. Thompson immediately turned on the tape recorder and readvised defendant of his constitutional rights, noting the change of mind on the rights form at 1:13 a.m. on June 17. The statement was completed at 2:31 a.m. Defendant was taken to the hospital for rape tests and then placed in jail.
About 1:00 p.m. the same day, defendant was taken from the jail back to police headquarters. He then gave another taped statement because the earlier recording was inaudible in many places. The two statements were approximately the same in substance.
Defendant then accompanied the police to the area along the highway between Natchitoches and Fort Polk where he had discarded the mask and wave cap. He also directed them to the tennis shoes, pistol and bullets that he had hidden near a culvert. During this trip, defendant spontaneously volunteered the statement that "I don't know why I shot the boy".
The trial judge suppressed defendant's first confession, apparently because defendant, after expressing his desire to deal with the police only through counsel, did not himself initiate further communications or discussions with the police and then knowingly and intelligently waive his constitutional rights, including his right to counsel. Edwards v. Arizona, supra. In *1183 ruling the second confession admissible, the judge noted that the statement was made freely, voluntarily and without threats, coercion or promises.
As to the first statement, defendant contended that the continuing conversation with him for the admitted purpose of "limbering him up" after he had refused to talk, culminated by the questions about murders at his previous army bases and about why he had killed the victim shown in the picture, was the functional equivalent of interrogation aimed at eliciting an incriminating response. Defendant relied on Rhode Island v. Innis, 446 U.S. 291,100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in which the accused invoked his right to counsel after being arrested for robbery with a sawed-off shotgun. When the arresting officers on the journey to the station talked about the desirability of finding the weapon because of the danger with a school for handicapped children nearby, the accused volunteered to show them the location of the weapon. The Court noted that "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent" and that words or actions which the police should know are reasonably likely to evoke an incriminating response amount to interrogation. Id. at 300, 301, 100 S.Ct. at 1689, 1689-90. Nevertheless, the Court held that the accused in that case had not been interrogated within the meaning of Miranda because the comments were just a few off-hand remarks made to someone not known to be susceptible to an appeal for the safety of handicapped children.
In the present case, the reference to the evidence of the crime, the musing about similar crimes at defendant's other military bases, and the exhibiting of the victim's photograph would lead an objective viewer to conclude that the officers' words and conduct were not just off-hand remarks, but were purposefully designed to elicit an incriminating response after defendant had invoked his right to remain silent. Moreover, this discussion of the crime and the direct question about why the defendant killed the boy was clearly interrogation initiated by the police after defendant had expressed his desire to deal with the police only through counsel, in violation of Edwards. The trial judge correctly suppressed this statement.
The second statement was also taken when the police initiated a questioning session after defendant's initial refusal to talk without the assistance of an attorney had been undermined by persistent interrogation or its functional equivalent. There is no indication in the record of anything but an inaudible tape and a lapse of twelve hours which distinguishes the two sessions.
The prosecution argues, however, that the decision in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), permits the use of a voluntary second statement when the initial statement was voluntary but technically violative of the Miranda rule. In Elstad, the accused made an inculpatory response to an unwarned question about his involvement in a burglary. The officer asked the unwarned question in the noncoersive atmosphere of the accused's own living room while another officer was in the kitchen telling the accused's mother of the arrest warrant. About an hour later at headquarters, the accused waived his Miranda right and voluntarily gave a full statement. The Court explained that the Fifth Amendment prohibits the use by the prosecution in the case in chief only of compelled testimony and that the technical failure to give a Miranda warning creates only a presumption of compulsion.[9] The Court accordingly held that a simple failure to administer Miranda warnings, "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will", does not necessarily render a subsequent voluntary and informed waiver ineffective, noting that suppression of the second statement in that *1184 case would not further the general goal of deterring improper police conduct or the Fifth Amendment goal of assuring trustworthy evidence.[10] 105 S.Ct. at 1293.
The present case involved more than a simple failure to administer Miranda warnings. Unlike the facts in the Elstad case, the police here administered the warnings, and defendant knowingly exercised his right to have an attorney present for any further questioning. The police did not honor this request, but rather continued the subtle (and later direct) interrogation without any initiative by defendant, in violation of the Edwards rule which was designed to protect an accused in police custody from being badgered by police officers. Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). That interrogation led to both confessions, the second interrogation in effect being merely a continuation of the first, and Edwards mandates the suppression of both. Otherwise, any time the police obtain a confession in violation of the Edwards rule, they could effectively validate the confession by taking a second confession twelve hours later on their own initiative.
We therefore conclude that the second confession, as well as the physical evidence derived therefrom, should have been suppressed and excluded from evidence.[11]
The remaining issue is whether the erroneous admission of the confession and the derivative evidence was harmless beyond a reasonable doubt. Under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the test is whether there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction. See also State v. Gibson, 391 So.2d 421 (La.1980). In a death penalty case, the jury has made two decisions, one on guilt and one on sentence recommendation, and the test for determining harmlessness must be applied to each of the jury's decisions.
The erroneous admission of a voluntary confession may be harmless beyond a reasonable doubt. Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); see also Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), which held that the erroneous admission of a codefendant's confession was harmless in the light of other overwhelming evidence, including the defendant's own confession. However, the significant probative value of a confession weighs very heavily in the balancing process necessary to determine whether the independent evidence remaining after the exclusion of the confession was so conclusive that there was no reasonable possibility the error contributed to the jury's decision.
In the present case, the only possible area of dispute at trial in the guilt phase was the identity of the person who committed the specifically intended killing during the perpetration of an aggravated burglary, an aggravated rape, and an armed robbery. The following independent evidence on the issue of identity remains after the exclusion of the confession and of the physical evidence derived as a result of the illegal confession:
1. Defendant's fingerprint was found on the light bulb on the Blackstons' rear porch.
2. A neighbor saw someone unscrewing the light bulb on the Blackstons' back porch at about the time the intruder entered the house.
3. The fingerprint expert was absolutely positive that the fingerprint on the light bulb was the fingerprint of the defendant.[12] *1185 4. Three members of the Metoyer family placed defendant in the vicinity of the Blackstons' home shortly before the murder.
5. A prosecution witness testified that he saw a small car, light in color, parked in the vacant lot next to the Blackstons' home at approximately 10:30 p.m. on the night of the murder. The front license plate contained a long name or writing. Defendant owned a light colored 1983 Toyota with the front license plate containing the writing "Felicia and Lee".
6. Chandra and Marjorie Blackston testified that the assailant wore a military-type mask during the murder and the rapes. Defendant was in the military stationed at Fort Polk.
7. Chandra and Marjorie Blackston testified that defendant is the same size, height, and general build as the assailant.
8. Lisa Metoyer told Lieutenant Thompson that defendant owned a chrome-colored pistol. The Blackstons testified that a chrome pistol was used in the crimes.
9. The manager of a pawn shop in Leesville testified that defendant pawned a Raven .25 caliber automatic pistol, serial number 915349, on two separate occasions prior to the homicide. A .25 caliber pistol was used in the murder.
10. Denise, Lisa and Joseph Metoyer testified that defendant wore white tennis shoes with black stripes going from the laces to the soles, a black wave cap, blue jean cut-off shorts and a dark shirt on the night of the murder. Chandra and Marjorie Blackston testified that the assailant wore blue jean cut-off shorts, a black wave cap, a dark shirt and white tennis shoes.
11. Lisa Metoyer testified that Tracy Lee had alcohol on his breath on the night of the murder, Marjorie Blackston testified that the assailant had alcohol on his breath.
12. Chandra Blackston, having seen the back of assailant's head when he took his wave cap off briefly, testified that he had no hair or very little hair. Defendant is totally bald except for some small patches of hair.
13. The fired hull found on the kitchen floor and the live round found in the back of defendant's vehicle were identical CCI Blazer bullets, which have a unique aluminum hull.
14. There was a bloody tennis shoe print in the kitchen, and there were tennis shoe tracks around the house, as shown by the plaster casts. Lisa, Denise and Joseph Metoyer testified that defendant wore tennis shoes the night of the murder. The Blackstons also testified that the assailant wore tennis shoes.
15. Chandra Blackston was robbed at gunpoint of $45.00, two twenty-dollar bills and five one-dollar bills. When defendant was apprehended, he had $45.00 folded in his pants pocket, consisting of two twenty-dollar bills and five one-dollar bills.
16. After defendant raped the victims, he sprayed Old Spice cologne on them. The blue jean cut-off shorts seized in the search of defendant's quarters gave off a sweet fragrance.
17. Defendant tried to commit suicide by slashing his wrists when he was in the CIC office after special Agent Byers left the room.
The circumstantial evidence introduced in this case on the issue of identity was abundant and exceedingly strong. However, it is the quality of the evidence, and not just the quantity, which is determinative in the harmless error inquiry.
A confession, of course, is convincing evidence of high quality in a case where identity is essentially the sole issue. When such a case depends on questionable eyewitness identification or circumstantial evidence, without any physical evidence which positively identifies the defendant as the perpetrator, the erroneous admission of a confession is unlikely to be harmless beyond *1186 a reasonable doubt. In the present case, however, the fingerprint evidence was of such high quality and was so totally conclusive in and of itself that any rational person, knowing that "fingerprints don't lie", would not have the semblance of a doubt about the identity of the murderer, even without the confession and the derivative evidence. The intruder was seen unscrewing the light bulb at the pertinent time, and the fingerprint lifted from the light bulb was positively identified as defendant's print. In the light of this positive and devastating evidence, corroborated by an overwhelming amount of other circumstantial evidence, there is no reasonable possibility that the jury would have reached a different verdict if the confession and derivative evidence had been excluded. Conversely, there is no reasonable possibility that the erroneously admitted evidence contributed to the conviction, and the error in the guilt phase is harmless beyond a reasonable doubt.
Even when the admission of a confession is harmless beyond a reasonable doubt in the guilt phase of a capital case, the harmless error analysis in the penalty phase could yield a different result because of the large amount of jury discretion involved in the sentence recommendation. However, the critical analysis in this case does not require a different result. As in the guilt phase, the confession served only to confirm the already positive identification of defendant as the murderer, and no rational juror could have had a semblance of a doubt about guilt that would influence the penalty recommendation. All other evidence which was presented to the jury pertaining to the circumstances of the murder and the character and propensities of the murderer was not affected by the confession or by any of the derivative evidence.
We therefore conclude that the erroneous admission of the confession and the derivative evidence was harmless beyond a reasonable doubt as to the jury's recommendation of death.
Capital Sentence Review
This court reviews every death sentence for excessiveness, using the following factors:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors,
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
La.C.Cr.P. art. 905.9.1.
Defendant was a twenty-five-year old black male, unmarried and without children or dependants. He was one of three children born of the marriage of Nelson Smith, who died in 1983, and Elnora Smith. His family remains in New York, where he was raised. He has a high I.Q., completed high school and had pursued several college courses. He had a relatively stable employment record up to the time he enlisted in the U.S. Army in 1981. He has no prior criminal record, but has been disciplined twice while in the military for minor infractions. He testified that he was high on alcohol and smoked marijuana prior to the crime.
(a) Passion, Prejudice and Arbitrary Factors
Race does not appear to have been an issue at trial. Both the defendant and the victim were black, and there were members of defendant's race on the jury.
The judge's instructions were correct statements of the law.
The prosecutor, in arguing for the death penalty, relied upon the fact that the murder had been committed during the perpetration of enumerated felonies, that it had placed more than one person at risk of death or great bodily harm, and that it was done in a particularly heinous manner. He stressed the findings of the various psychiatrists that had examined defendant, all of who concluded defendant was legally sane and of normal to above average intelligence. He also emphasized the great care defendant went to in order to "cover his tracks"the mask, the care he took to *1187 wipe his fingerprints from the scene, his discarding the evidence after the murder, his recovery of one of the spent cartridges, and his lying to one of the examining psychiatrists about his use of LSD prior to the murder to influence the sanity decision. Finally, the prosecutor argued to the jurors that defendant responded to the pleading of the victim's mother by going back into the kitchen and shooting the boy in the back of the head.
Defense counsel focused on defendant's good reputation, his excellent military record, and the many stress factors he was experiencing at the time of the killing. Counsel argued that a person under the influence of extreme mental or emotional disturbance can lose sight of the criminality of his conduct and can lose the ability to conform his conduct to the requirements of law. In a final plea for mercy, counsel argued that the mental disease or defect must have overwhelmed defendant's otherwise reputable behavior, resulting in a tragedy for defendant's family as well as the Blackstons.
To this plea for mercy, the prosecutor on rebuttal asked the jurors to think about the quality of mercy exhibited by defendant when he shot the disabled wounded boy in response to the mother's pleas and then raped the women twice.
The arguments, though highly charged, provide no indication that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors.
(b) Aggravating Circumstances
The jury found the existence of five statutory aggravating circumstances:
1. Defendant was engaged in the perpetration of an aggravated rape;
2. Defendant was engaged in the perpetration of an aggravated burglary;
3. Defendant was engaged in the perpetration of an armed robbery;[13]
4. Defendant knowingly created a risk of death or great bodily harm to more than one person; and
5. The offense was committed in an especially heinous, atrocious or cruel manner.
The evidence was clearly sufficient to support the jury's findings with respect to the first three statutory aggravating circumstances.
The testimony of Marjorie and Chandra Blackston clearly established that the intruder, shown by other evidence to be defendant, entered the inhabited residence without authorization, with the intent to commit a felony or theft therein and while armed with a gun; that he had intercourse without the consent of the victims who were prevented from resisting because he was armed with a gun; and that he took money within the immediate control of the victim by use of force while armed with a gun. La.R.S. 14:60, 42 and 64.
When at least one statutory aggravating circumstance found by the jury is supported by the record, it is not necessary to determine that other statutory aggravating circumstances found by the jury are also supported by the record, as long as the evidence of the possibly unproved aggravating circumstance did not inject an arbitrary factor into the proceeding. Zant v. Stephens, 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982); State v. Wingo, 457 So.2d 1159 (La.1984). Since the evidence of the risk of death or great bodily harm to more than one person and of commission of the killing in an especially cruel manner did not inject an arbitrary factor into the proceeding, it is unnecessary to determine whether these aggravating circumstances were supported by the record.
(c) Proportionality of the Sentence
A comparative proportionality review is not constitutionally required, as long as the state's overall capital sentencing system provides adequate protection against the arbitrary infliction of the death penalty. Pulley v. Harris, 465 U.S. 37,104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, this court, pursuant to Supreme Court Rule *1188 XXVIII § 1(c), conducts a proportionality review as a further safeguard against arbitrariness.
There have been only three capital homicide cases since January of 1976 in Natchitoches Parish. In State v. Smallwood, there was a multiple murder, but three consecutive life sentences were imposed as a result of a plea bargain agreement. In State v. Dison, a black contract killer shot a white male as he left his home. In Dison, as well as in the third case, State v. Demars, which involved an unprovoked shooting in a nightclub, the jury declined to return the death penalty.
None of these cases are comparable to the instant case. This court, however, has affirmed many death penalties when the killing occurred during the perpetration of either an aggravated burglary, an aggravated rape or an armed robbery. The present case contained all three of these most serious aggravating circumstances, as well as the additional factor that the killing occurred in the victim's own home. See, for example, State v. Wingo, 457 So.2d 1159 (La.1984); State v. Glass, 455 So.2d 659 (La.1984). In Wingo, the court noted that the murder of a person by an intruder who "violated the sanctuary of the victims' own home [is] a particularly terrifying sort of crime to decent, lawabiding people". 457 So.2d at 1170.
The mitigating circumstances urged by defense counsel included defendant's lack of a prior criminal record, his possibly impaired capacity caused by alcohol and marijuana use on the night of the crime, and the influence of the mental disturbance and stress from the termination of his relationship with his girlfriend, his uncontrolled loss of hair, and his fear that he had herpes. These factors, considered in the light of the extremely serious aggravating circumstances, do not render the death penalty for this murder disproportionate.[14] See State v. Nelson, 459 So.2d 510 (La. 1984).
Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing rules for applying for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
DENNIS, J., concurs with reasons.
CALOGERO, J., concurs in part, dissents in part and assigns reasons.
DENNIS, Justice, concurring.
I respectfully concur in the decree affirming the conviction and sentence, but disagree with the majority in the following particulars:
The majority says, "Under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the test is whether there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction." This is, however, only part of the Chapman test, as recognized by this court in State v. Gibson, 391 So.2d 421 (La.1980). This court in Gibson said:
It appears that the Chapman test, i.e., "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and that "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt," will assist this Court to fulfill both of the requirements of state law.
State v. Gibson, 391 So.2d at 428. Nevertheless, because of the overwhelming independent *1189 evidence on the issue of the identity of the murderer, the majority's failure to fully appreciate the Chapman test as articulated in Gibson does not prejudice the defendant.
Also, the majority states, "A comparative proportionality review is not constitutionally required, as long as the state's overall capital sentencing system provides adequate protection against the arbitrary infliction of the death penalty. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed. 2d 29 (1984). However, this court, pursuant to Supreme Court Rule XXVIII, § 1(c), conducts a proportionality review as a further safeguard against arbitrariness." This statement is correct but incomplete because it disregards our holding in State v. Brogdon, 457 So.2d 616, 631 (La.1984), that "[t]his court is required by our state constitution and its own rule in each capital sentence review to conduct a comparative proportionality review to determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Citing La. Const. art. I, § 20; La.Supreme Court Rule XXVIII; State v. Lathers, 444 So.2d 96, 97 (La.1983); State v. Sepulvado, 367 So.2d 762 (La. 1979), and other authorities.
CALOGERO, Justice, concurring in part and dissenting in part.
I concur in this Court's finding that the defendant's conviction should be affirmed. However, because I believe that the improper introduction of a confession can never constitute harmless error with regard to the penalty phase of a capital proceeding, I dissent from the portion of this Court's judgment which affirms the defendant's sentence of death.
In my opinion, the issue of whether the improperly admitted confession requires reversal of the defendant's conviction is a close one. As the majority opinion notes, the impact of a confession on the trier of fact is usually so significant that improper admission of the confession can hardly be considered "harmless" beyond a reasonable doubt. Further, while the United States Supreme Court cases cited by the majority do stand for the proposition that the improper admission of a confession can be harmless error, both of those cases involved trials in which at least one other properly admitted confession was considered by the jury. Thus, the case for harmless error was somewhat more compelling in those decisions than in the present case, where no other confession was admitted into evidence.
On the other hand, the harmless error argument has more validity in this case, where the confession was improperly obtained but nonetheless voluntarily given, than it would if we were faced with an involuntary or coerced confession. As we noted in State v. Seward, 509 So.2d 413 (La.1987), "[i]t may ultimately be found that the admission of a coerced confession can never be treated as harmless error." (Emphasis in the Opinion) We posited that an involuntary confession obtained as the result of physical abuse might vitiate any conviction, regardless of whether that conviction was otherwise supported by sufficient evidence, citing Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). Here, however, there is no evidence that the confession was coerced, even though it was taken at a point after which the defendant indicated that he did not want to answer questions and wanted to speak with an attorney, and was therefore invalid under established constitutional precepts.
Arguably, then, a non-coerced but improperly admitted confession can constitute harmless error in certain limited circumstances. Because the United States Supreme Court has indicated as much, and because I agree with the majority that the independent evidence of guilt in this case was so strong, I join the Court in affirming the defendant's conviction.
However, I believe that different considerations apply when considering the impact of a confession on the jury's decision to impose the death penalty. Whereas a single juror who votes "not guilty" knows that he cannot produce an acquittal if he "holds out" against the desire of the remaining *1190 jurors to convict, a single recalcitrant juror who favored life imprisonment over the death penalty in this case would have known that he held within his hands the right to decide whether the defendant should live or die. (The jury was instructed by the court that if it was unable to unanimously agree on the imposition of the death penalty, the defendant would be sentenced to life imprisonment.) As a consequence, it is pure speculation on the part of this Court to say that the State's nail in the coffin in this casethe inadmissible confessioncould not have influenced a single juror in the penalty phase. If there were any jurors who, although certain enough of guilt to vote for conviction, harbored minor uncertainties or trepidations as to the state's circumstantial evidence, certainly it is possible that such jurors, had they not been exposed to the confession, would have held out for the imposition of a life sentence rather than the death penalty. Only one juror would have had to have been so swayed in order to prevent the imposition of the death penalty. Thus, I cannot conclude that the impact of the inadmissible confession on the jury's penalty deliberations was harmless "beyond a reasonable doubt."
For the reasons stated, I concur in the Court's decision to affirm defendant's conviction, and respectfully dissent from that portion of the majority opinion which affirms the imposition of the death penalty. I would remand the case to the district court for a new sentencing hearing, before a jury which has not been exposed to the improperly obtained confession.

ON REHEARING
CALOGERO, Justice.
Defendant's confession was procured in violation of his Sixth Amendment right to counsel under the United States Constitution, we held on original hearing. Improperly admitted into evidence, that confession described the brutal nature of his crimes in explicit and unremorseful detail. Is there a reasonable possibility that this taped confession might have contributed to at least one juror's decision to recommend the death penalty? That is the narrow issue which we consider on rehearing.[1] During the course of the taped confession, the defendant unemotionally recounted the manner in which he twice shot his fifteen year old victim in the head, and then raped the victim's mother and sister:
Thompson [a detective]: Okay when you ran into the little boy, what happened right when you ran into the little boy?
Defendant: Then we just stopped and he looked at me and then he said something.
Thompson: Do you know what he said?
Defendant: No, I don't. I didn't understand what he said.
Thompson: Okay. What happened then?
Defendant: Then I shot him.
Thompson: Okay. Speak up a little bit.
Defendant: Then I shot him.
Thompson: Where did you shoot him?
Defendant: In the head.
Thompson: In the face part?
Defendant: I don't know, just in the head.
* * * * * *
Defendant: And then I went back in there to close the back door, the boy was lying on the floor. He was jerking like this.
Thompson: Was he bleeding?
Defendant: Yeah, lying in blood.
Thompson: Okay, what happened then?
Defendant: I shot him again.
* * * * * *
Thompson: Okay, which one [the mother or the sister] did you rape first?
Defendant: Ah, shit. I ain't sure. It must have been the mother first.
* * * * * *
Defendant: I must have raped the girl first, because the girl had on some shorts and I wanted to take the shorts off and *1191 that's when the mother started screaming. I think the girl cried. So I said to her. I asked her if she wanted to die.
This confession was elicited from the defendant after he had told authorities that he did not want to answer questions and that he wanted to confer with an attorney. As discussed in more detail in the majority opinion on original hearing, the confession was therefore procured in violation of defendant's Sixth Amendment right to counsel. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Thus, the confession should have been excluded from evidence.[2] Its admission constituted error of constitutional dimension.
But was the error harmless? The test for harmless constitutional error is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963); State v. Gibson, 391 So.2d 421 (La.1980). Before a constitutional error can be considered harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24, 87 S.Ct. at 828. If there is a reasonable possibility that the evidence complained of contributed to the verdict, then it can hardly be concluded beyond a reasonable doubt that the error was harmless.
On original hearing, we concluded that the introduction of the confession was harmless error with respect to the guilt phase of the defendant's trial. Our reasoning was that the state conclusively established through untainted and overpowering circumstantial evidence that the defendant was the perpetrator. We have been presented with no argument or authority which persuades us to change our view on this issue, so we adhere to our conclusion on original hearing that the use of the confession did not vitiate the conviction.
However, there is the independent question of whether the use of the confession was harmless error with respect to the penalty phase of the trial. The majority on original hearing concluded that it was, again relying on the fact that the state presented independent and overwhelming evidence of the defendant's guilt. The majority posited that "[a]s in the guilt phase, the confession served only to confirm the already positive identification of the defendant as the murderer, and no rational juror could have had a semblance of doubt about guilt that would influence the penalty recommendation."
We granted rehearing to consider defendant's contention that considerations other than the guilt of the accused are pertinent to the harmless error inquiry in the penalty phase. Defendant points out that even if the state's untainted evidence convinced the jury of the defendant's guilt, the critical and separate question for the jury to decide was whether he should be sentenced to life imprisonment or death. In order to make that determination, the jury looked, at least in part, to the character and the propensities of the accused. In this context, defendant argues, there is a very real possibility that the confession contributed to at least one juror's decision to opt for the death penalty instead of a life sentence.[3]
We find this argument persuasive. There is surely a reasonable possibility that this evidence might have contributed to the jury's decision. Listening to the confession, particularly those portions in which the defendant describes his conduct with *1192 apparent indifference, certainly could have led one or more members of the jury to conclude that he felt no remorse for his deeds. A juror listening to the confession also could reasonably be expected to experience strong emotions, ranging from mortification to outrage. Such impressions or emotions could in turn have contributed to the decision of one or more jurors to impose the death penalty.
Another consideration is that even though the evidence of defendant's guilt was overpowering, that evidence was nonetheless circumstantial. Even if the jury was certain enough of the defendant's guilt to convict (without hearing the confession), one or more jurors might have retained minor trepidations about the nature of the state's circumstantial evidence, or felt a general ambivalence about imposing the death penalty. Such uncertainty, though not rising to the level of reasonable doubt regarding guilt, might have led such a juror to hold out for a life sentence. However, any such juror reservations might well have been swept away by the introduction of the confession.
We therefore cannot declare a belief that the introduction of the confession was harmless beyond a reasonable doubt with respect to the jury's decision to impose the death penalty. We also cannot say that there is no reasonable possibility that the confession might have contributed to at least one juror's decision to impose the death penalty.
It is important to emphasize that under Chapman and Gibson, the harmless error inquiry is not whether the confession did in fact sway the jury's penalty determination, but whether there is a reasonable possibility that the confession contributed to the death penalty determination.[4] It is not our function, nor the function of the harmless error doctrine, to assess how this particular jury actually did come to the conclusion that the defendant should be sentenced to death. We were not privy to their deliberations, and we "will not pretend omniscience,... particularly when considering the fate of one sentenced to death...." Johnson v. State, 292 Md. 405, 439 A.2d 542, 562 (1982).
Instead, we apply the objective test of whether there is a reasonable possibility that the error complained of contributed to the jury's decision. Whether such a possibility exists "is a question of law to which our appellate jurisdiction extends." Gibson, 391 So.2d at 427. This objective inquiry requires us to consider each and every reasonable possibility that the error contributed to the outcome. When, as here, such reasonable possibilities exist, we are not free to ignore them in favor of the speculative conclusion that this jury might have imposed the death penalty even if it had not heard the confession.
We have not previously considered whether an improperly admitted confession which is harmless in the guilt phase of the trial may nonetheless require reversal of the death penalty. However, we note that other jurisdictions have reached that conclusion. See, e.g., People v. Frank, 38 Cal.3d 711, 735, 214 Cal.Rptr. 801, 700 P.2d 415, 428 (1985); Cannaday v. State, 455 So.2d 713, 724 (Miss.1984); King v. State, 657 S.W.2d 109, 112 (Tex.Crim.App.1983).
In Cannaday, the state introduced the defendant's pre-trial statement that she "took the [victim's] head and shook it and tried to break it off." As was the case here, the statement was elicited from the defendant in violation of the her right to *1193 counsel and the custodial interrogation rules set forth in Edwards.
The Mississippi Supreme Court concluded that the erroneous admission of this incriminating statement did not require reversal of the defendant's conviction because the evidence of guilt was "so overwhelming that the jury could have reached no other conclusion." 455 So.2d at 723. However, the court concluded that "this violation of the defendant's Sixth Amendment right to counsel so infected the sentence phase that reversal of that phase must be ordered." Id. at 724. King and Frank involve similar holdings.[5]
After the taped confession had been heard by the jury, and the verdict of guilt returned, the defendant conferred with his counsel and decided to testify during the penalty hearing. (He did not testify during the guilt phase of the trial). During his testimony at the sentencing hearing, the defendant described the murder and the related offenses in much the same manner that he did during the taping of the confession. The state argues that this testimony had at least the same impact on the jury that the taped confession did, if not more, and that the earlier use of the confession was thereby rendered harmless.
This argument ignores the fact that the defendant only took the stand after the taped confession was improperly used against him. Defense counsel asserts that if the confession had not been used, defendant would not have testified. Once the confession was used, defense counsel believed that their client had nothing to lose by testifying during the sentencing hearing. To the contrary, they hoped that his testimony would "humanize" him before the jury and offset the impact of the taped confession.
In order to resolve this issue, we are not required to answer the speculative question of whether the defendant would have testified if the confession had not been used. The reality is that the defendant and his counsel never had the opportunity to make a decision about whether he should testify under those circumstances, because the confession was used.
Instead, we focus on the question of whether the defendant's Fifth Amendment right to remain silent, and not take the stand, was compromised by a perceived need to respond to the unconstitutionally obtained and improperly admitted evidence. The state cannot, through the use of unconstitutional procedures or evidence, make more onerous the defendant's exercise of his Fifth Amendment privilege, thereby exacting a penalty against him if he chooses not to testify. Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).
Any defendant, in deciding whether or not to take the stand, would obviously be influenced by the fact that a taped confession such as this one had previously been heard by the jury, and by the perceived need to counteract the same. It would be anamolous and unjust for us to hold that the defendant's testimony obviated the prejudicial error, when in fact his testimony may have been prompted by that error. Under these circumstances, we conclude that his testimony did not render the use of the confession harmless.

DECREE
We reinstate in part and reverse in part our decree on original hearing. Defendant's *1194 conviction for first degree murder is affirmed. The death penalty is vacated. The case is remanded to the district court for a new sentencing hearing as provided for in La.Code Crim.Proc. art. 905.1(B).
ORIGINAL DECREE REINSTATED IN PART AND REVERSED IN PART; CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED.
LEMMON, J., dissents and assigns reasons.
COLE and MARCUS, JJ., dissent for reasons assigned by LEMMON, J.
LEMMON, JUSTICE, dissenting in part.
I adhere to our decision on original hearing that the error in admitting the confession was harmless beyond a reasonable doubt in both the guilt and penalty phases of the trial.
This is not a circumstantial evidence case, as characterized by the majority. This is a case in which overwhelming circumstantial evidence (listed in the opinion on original hearing) was combined with the direct evidence of an eyewitness that the intruder unscrewed a bare light bulb on the Blackston's back porch about 10:00 p.m. on the night of the murder and with the incontestable physical evidence that the fingerprints of the defendant (who had never before been in the house) were found on the bulb.
The fingerprint evidence, in tandem with the eyewitness testimony, not only takes this case out of the circumstantial evidence category, but also provides the basis for determining the admission of the confession was harmless beyond a reasonable doubt. The Supreme Court of the United States has held that the erroneous admission of a voluntary confession may be harmless beyond a reasonable doubt, at least when there were other confessions by the defendant. Here, the fingerprint left by defendant was the functional equivalent of a confession by him that he was the intruder who unscrewed the bulb before entering the residence to commit the rapes and murder. The gruesome and gory details] of defendant's crimes inside the house were related to the jury by the terrified victims of the rapes and witnesses to the murder. These witnesses painfully and emotionally described every fact which defendant stated in his confession except his identity, and that fact was established beyond doubt by the fingerprint evidence.
I simply cannot conclude that any rational juror would have experienced stronger emotions of mortification or outrage from listening to defendant's description of the events than from listening to the descriptions given by the horrified victims of this indescribably horrible crime. Under the overall evidence, viewed from any objective standpoint, there is no reasonable possibility that the erroneous admission of the confession contributed to the jury's decision on either guilt or sentence.
NOTES
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] A neighbor saw someone on the porch unscrew the light bulb about the time of the crime.
[3] The fired bullet hull found in the Blackstons' kitchen and the live round found in defendant's car were identical.
[4] Thompson included this information in the application for the search warrant which he eventually obtained.
[5] The other allegations of misrepresentations in the affidavit referred to insignificant discrepencies. Whether defendant's former girlfriend said defendant choked her after forcing her down to the floor or forced her down onto the bed with his hand on her throat makes little or no difference in the determination of probable cause. Neither does the description of the wave net in the affidavit as black, when the girlfriend testified she didn't mention a color, because the Blackstons simply said the murderer was wearing a wave net.
[6] Thompson talked to Lisa Metoyer by telephone several times between her first contact with him about 3:00 a.m. and the notice from the military police at 6:30 a.m. that defendant had been taken into custody. He simply "jotted down" parts of the conversations. A written statement from the girl was taken later by another officer.
[7] When false information is included in an affidavit with deceitful intent, this court has quashed the warrant. State v. Paster, 373 So.2d 170 (La.1979).
[8] The concurring justices objected to the possibility that the broad holding created a new per se rule. They preferred to base the decision on existing principles for determining whether resumption of interrogation is the result of a voluntary waiver and not to emphasize the single element of initiation, noting that police may legitimately inquire whether an accused has changed his mind about talking to them without an attorney. Later, in Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Court stated that Edwards in effect set forth a prophylactic rule designed to protect an accused in police custody from badgering.
[9] A voluntary confession which is taken in violation of the prophylactic rule of Miranda is not admissible in the prosecution's case in chief, but may be used to impeach the accused if he takes the stand. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).
[10] Because the first statement was clearly voluntary and not coerced, nothing in the Constitution required suppression of the first statement. Only the prophylactic rule of Miranda dictated that result.
[11] The admissibility of nontestimonial evidence obtained as a result of a voluntary statement obtained in violation of a per se rule may still be an open issue. See New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), (O'Connor, J., concurring in part and dissenting in part).
[12] The expert compared the print lifted from the light bulb with the ink impression of defendant's right index finger and found twenty-four points of identification. Only twelve points are required for a positive identification.
[13] The first three statutory aggravating circumstances are based on La.C.Cr.P. art. 905.4A(1). The fourth and fifth are based on La.C.Cr.P. art. 905.4A(4) and (7).
[14] The only case in which this court set aside a death penalty as disproportionate was State v. Sonnier, 380 So.2d 1 (La.1979). The younger of two brothers who raped and murdered a young girl was spared, not because of the lack of significant aggravating circumstances, but because he was under the domination of his older brother (who has since been executed) and played a relatively minor role in the horribly vicious crime.
[1] On original hearing, we affirmed defendant's first degree murder conviction and death sentence. We ascribe no merit to the arguments asserted by defendant on rehearing which challenge the validity of the conviction, and address only his argument that the death penalty should be overturned because of the admission of the confession.
[2] In a case such as this one, the exclusionary rule is "designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in Edwards was." Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).
[3] A single juror could have prevented the imposition of the death penalty, as our law requires the trial judge to impose a sentence of life imprisonment if the jury cannot unanimously agree on a sentencing recommendation. La. Code Crim.Proc. art. 905.8. Thus, if an error influences even one juror's decision in the penalty phase, that error cannot be considered harmless. See State v. Rushing, 464 So.2d 268, 277 (La. 1985) (Lemmon, J., dissenting in part.)
[4] In both Chapman and Gibson, the harmless error rule was applied to the jury's decision to convict. Neither case involved the application of the death penalty. However, we have subsequently used similar harmless error analysis when reviewing the alleged prejudicial impact of errors in the penalty phase of capital trials. See, e. g., State v. Brown, 514 So.2d 99, 107 (La.1987); State v. Rushing, 464 So.2d 268, 275 (La.1985); State v. David, 425 So.2d 1241, 1250 (La. 1983). When reviewing error in the sentencing phase of death penalty cases, the United States Supreme Court has also used harmless error analysis that is similar toand at least as exacting asthe Chapman test. See, e.g., Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 1672-73, 90 L.Ed.2d 1 (1986). See also Ritter v. Smith, 726 F.2d 1505, 1517-19 (11th Cir.1984) and authorities cited therein; Comment, Deadly Mistakes: Harmless Error in Capital Sentencing, 54 U.Chi.L.Rev. 740, 748-49 (1987).
[5] In King, the state improperly introduced evidence of the defendant's oral confession to an unrelated offense. The Texas Court of Criminal Appeals was "unable to conclude that there is not a reasonable possibility that the admission of the oral confession did not materially affect the jury's decision" in the penalty phase. 657 S.W.2d at 112. In Frank, the prosecution introduced the defendant's personal notebooks, obtained by an improper warrant, and those notebooks contained certain remarks linking the defendant to the offense charged and establishing his propensity to molest children. The California Supreme Court held that the introduction of the notebooks was harmless with respect to the guilt phase of the trial, but was not harmless in the penalty phase. 214 Cal.Rptr. at 811, 813-14, 700 P.2d at 425, 427-28. The fact that the same error may be prejudicial in the penalty phase and harmless in the guilt phase was also recognized in People v. Brisbon, 106 Ill.2d 342, 371-72, 88 Ill.Dec. 87, 100-101, 478 N.E.2d 402, 415-16 (1985).